Final case of the morning is Sierra Forest Legacy v. Ray. This is a case in Tuolumne County. Good morning and may it please the court. My name is David Edelson. I represent the appellants, Sierra Forest Legacy, Sierra Club, Natural Resources Defense Council, the Wilderness Society, and Center for Biological Diversity. I'd like to reserve five minutes, please, for rebuttal. At the heart of this appeal is whether appellants are likely to prevail on the merits of their challenge to the 2004 framework, a Forest Service logging plan that favors commercial logging at the expense of old forests. In adopting the 2004 plan, the Forest Service ignored the unanimous opposition of leading scientists, swept under the rug the plan's adverse impacts, and failed to consider reasonable alternatives other than increased logging. In addition, the Forest Service failed to develop an adaptive management plan, which the agency's own chief said was essential in order to ensure the viability of wildlife. Cross motions for summary judgment were briefed and argued nearly two years ago. In the meantime, when the Forest Service began to implement the Sierra Nevada framework in earnest, appellants moved for preliminary injunction with respect to three large logging projects, the Basin, Slapjack, and Empire projects on Plumas National Forest. Together, these three projects will log over 12,000 acres of national forest land, including many thousands of acres of old forest habitat that provide habitat for species such as the California spotted owl. Judge England denied our motion for preliminary injunction, and this appeal followed. Much of the controversy in this case involves the logging of old forests. The 2004 framework and the three challenge projects will degrade old forest habitat by logging trees 20 inches diameter and larger, and by substantially reducing the canopy cover that is an important element of habitat for old forest species. The record makes clear that the Forest Service is logging these larger trees not to reduce wildfire risk, but rather to generate increased revenues. And let me quote very briefly from excerpts of record at page 817. Quote, the 2004 framework was developed to provide opportunities for increasing available funds for fuels reduction work on the national forest. This alternative increases revenues by permitting the removal of some medium-sized trees. We would challenge that. We believe the trees are large trees. The excerpts continue to say that the SEIS does not suggest that removing these trees will alter stand structure in ways that significantly enhance fire protection. The 2004 plan generated ñ And it is, just so we understand on the other side of the equation, there is an enormous concern, is there not, about fire protection. I mean, that has, as the briefs say, been illustrated by the fires that burned through California just this last year. You don't dispute, I gather, that there is a very legitimate interest in addressing the forest cover, the forests, in the interest of fire protection. That's correct. Not only do we not dispute it, but we support legitimate fuels reduction efforts. In fact, for that reason, we are only seeking to enjoin the three projects to the extent that they are inconsistent with the 2001 framework, which is the preexisting management plan. So that leads to me, then, to my question. The district court, in a somewhat cryptic statement, posited in the balancing part of its opinion that what the government was proposing to do was better than your alternative of doing nothing. And it's my understanding that it wasn't advocating doing nothing, but I don't know whether he was referring to the practical impact of going your way on clearing these forests in some fashion or another, or whether it was that you would cut fewer trees or what. Can you explain to me, if we ruled in your favor, and that is allowed the government to proceed under the earlier plan, what would be the difference in cutting of old-growth forests that would follow? The difference, in part, would be that the larger trees, which do not contribute to the wildfire risk, would not be logged. So none of them. None of them could be cut. The specific answer is that logging would proceed pursuant to the 2001 framework, which is difficult to encapsulate in a simple sense. I know it is. I've been trying to understand it. For example, in the defense zone, which is the area closest to communities, the plan, the 2001 plan, actually would allow virtually the same logging as is allowed under the 2004 plan. So it takes care that in those very important areas near communities, the full amount of logging could proceed. The difference is that in areas farther away, more in the back country, that the agency would need to remove only smaller trees, that is trees up to approximately 20 inches in diameter, and it would leave the rest, in essence. But in terms of Judge England's confusion, we think that he was confused, and he failed to consider that it was not an either-or proposition, that there was a middle course. Is it possible that he was saying that if he were to issue an injunction, the government practically would be no logging or no clearance because it was not feasible to just do the smaller trees for economic reasons? I think that is certainly what the Forest Service argues. With all due respect, it's an incorrect argument. There's no reason that the Forest Service cannot seek funds from Congress in order to, if their goal is to do this kind of work, they can and do routinely seek funding from Congress. In fact, the Quincy Library Group Act itself routinely receives on the order of $25 million or more in order to fund these kinds of activities. So there's no reason that this kind of activity could not go forward, although it's possible that it would require increased funding and it could not simply be entirely funded by logging the larger trees, as the Forest Service is now proposing. Can I ask you another thing? What is the relation between the reduction of habitat and the reduction of the species? I think there were percentages there as to the effect on habitat, but what is the effect on species to reduce habitat? Your Honor, in this case, the experts on the California Spotted Owl, the experts on the Pacific Fisher and the American Martin were unanimous in saying that the habitat reduction that would occur here would adversely affect those species and, in fact, would threaten their viability. This is not a case where there is a dispute among experts. The leading experts were unanimous. But they're not able to give any percentage impact. There was no specific percentage impact, but the habitat reduction has got a wonderful concreteness about it, but the species effect is somewhat vague. And I want to follow up on that. What do you consider the location of the species? Where is the species located? Well, the California Spotted Owl, Your Honor, is located throughout all three project areas. That's one of them. Well, where else is it? Elsewhere in the Sierra Nevada, primarily in the... I understand it's also in Southern California. That's correct. Well, is that not the species? Yes, that is the same species. And will something that happens in Northern California affect the Southern California owl? Well, it could potentially affect the viability of the species throughout its entire range, yes. How would that happen? That would happen because a population could become isolated in one portion of the range. Let's say, for example, in the area we're talking about, the Martin, one of the species at issue, has been extirpated because of the same kind of logging that's being carried out here. Well, I'll tell you, the Martin and the Fisher, you're just guessing that they might come back. What is their range? Where do they live? The Fisher is, at this point, been limited to a fairly small area in the Southern Sierra, south of Yosemite, as well as areas in Northwestern California. So there's a large gap in the Fisher's range at this point. But they're in places other than the Sierra. Is that correct? Yes, that is correct. And how about the Martin? Similarly. Now, as far as the cutting that would take place under the 2004, as far as the Fisher and the Martin, and I'm not related to that Fisher, by the way, there would be no direct effect within the cutting areas. As I understand it, it's an indirect effect. That's correct, Your Honor. Whereas with the owl, there are owls that are within or purported to be within the cutting areas. That's correct. And further, it's our position, to speak to the irreparable harm for a moment, that Judge England erred in requiring he applied an erroneous legal standard. He required us not only to show the possibility of irreparable harm, but rather to show that these three projects would affect the species as a whole. And under this Court's precedence, logging of old forest itself constitutes irreparable harm. There's no need to show that the species as a whole will become extinct as a result of logging projects. And the reason for that is that once these old forests are logged, they will not regenerate for many years, if ever. And, therefore, their loss cannot possibly be compensated for by monetary damages. Okay. One more question that is bothering me is on this alternative sources of funding. It does seem clear from the documentation that the old growth cutting is, in fact, in there to make logging economically feasible. And there's talk in the documentation about limited funds available and so on. What does the record reflect as to realistic opportunities for alternative funding, given, as you say, there's a strong interest in fire management? What the record reflects, Your Honor, is that the Forest Service failed to consider any alternatives other than increasing logging of large trees. Well, you say they failed to consider, but is it all on them to come up with alternatives? I know the state seems to be in here somewhere in California. Yes. But is there some realistic alternative that's been put on the table by somebody? Yes. There are realistic alternatives. This is discussed in some detail in the amicus brief of the Attorney General. Reasonable alternatives were suggested, but the Forest Service did not take a hard look at those, as required by NEPA. And I would point the Court to the Muckleshoot Indian Tribe cases. Did the state of California come in before the district court or before us? They have a case in the district court. They do have their own case, Your Honor, which is also pending at this point. So did Judge England have before him any of the evidence relating to potential alternatives when he was ruling on your motion? Yes, he did. That record is in the record. And there were alternatives that were suggested by the Resources Agency of California. This was during the administrative proceeding, as well as by the Attorney General in their comments on the environmental impact statement. So this is not an issue that's being raised. Let me just go back to something you just said, is that your position is this could have no effect on the species. It could have no effect on the species, and you would still be entitled to an injunction because of the effect on the trees. I do believe that's the case, but that is not the case in front of us, because in the case in front of us, not only is there evidence that substantial acres, thousands of acres of old forest will be logged, but there's also substantial evidence in the record that that logging will have adverse impacts on these species. And what is the authority for that it's sufficient if it's the trees? Sorry, Your Honor. What is the authority for the proposition that it is sufficient if it's merely the trees? There are a couple of cases on point. One is Lands Council v. Martin. That's 479F3rd at page 643. Is that the one that's on there? No, that is not. No? That's a different Lands Council case. It's Lands Council v. Martin, and it's quite relevant because this Court held there that logging of 21-inch trees and greater constituted irreparable harm. So factually, it's quite analogous. Another case, Your Honor, is Neighbors of Cutty Mountain, which is an older case. I don't have the site, but both of those cases are in our reply brief at pages 24 to 25. Thank you. Now, one question was asked about what's the relationship between the logging of old That leads to a significant problem with the plan here, and it has to do with adaptive management. Now, what adaptive management is, is it's a process for changing a plan in order to address the effects of plan implementation. It's essentially like a feedback loop that will ensure that adverse impacts will not occur. Now, in this case, the Chief of the Forest Service, in reviewing the administrative appeals of this plan, he found that because the 2004 plan incurs greater risk to wildlife, that the viability of these species can only be assured by using adaptive management. And he further found that the 2004 plan failed to include such an adaptive management plan. At most, it outlined the initial steps of such a plan. This wasn't just the opinion of the Chief of the Forest Service. For example, the Science Consistency Review Team, which was a team put together by the Forest Service, they say at excerpts of record, page 311, that the 2004 framework likely incurs greater risk to owl persistence. And this is a quote, This makes it critical that a defensible adaptive management program is an integral part of implementation in order to address key uncertainties. The Fish and Wildlife Service, the U.S. Fish and Wildlife Service, in their comments made a similar point. They urged that the plan make a much stronger commitment to adaptive management. And that's in the excerpts of record at 878 to 879. The problem is there is no adaptive management here. There's no adaptive management plan that was adopted when the plan was itself adopted. And, in fact, the plan is being implemented. So it's being implemented without this adaptive management plan that the Chief of the Forest Service said was necessary to ensure species viability. I would point the Court to the Western Watersheds Project versus U.S. Forest Service case, which is cited in our reply brief at page 13. It's a well-considered district court opinion from Judge Windmill from Idaho, where he held that given the fact in that case that adaptive management was so important to complying with the law that the failure to include an adaptive management plan as part of the decision itself violated the National Forest Management Act. We think that the case is similar here and that a similar result should apply. I want to come back and speak briefly to one of our NEPA arguments, and that is the failure to explicitly acknowledge and respond to scientific opposition. Now, we acknowledge that the Forest Service, as a general matter,  However, NEPA requires that there be explicit acknowledgement and response to the opinions of leading experts. In this case, every spotted owl biologist who commented on the plan opposed it. And it wasn't just in a form letter, Your Honor. There were detailed comments that are included in the record explaining why the plan would adversely affect the owl and why it would threaten species viability. Similar, the experts on the Pacific Fisher and the American Martin were also unanimous in their opinion that the plan would adversely affect those species. The problem here is that you can read the entire EIS from cover to cover and never realize, never be informed that these leading experts opposed the plan for substantial reasons. And this Court in the Center for Biological Diversity case and in other cases has held that when there is responsible opposing views, the agency is required to explicitly acknowledge and respond to those views. Do you want to save your last two minutes for rebuttal? Yes, I would, Your Honor. Thank you. Let me ask you one question that doesn't come out of your time. What's the status of this case in the district court? Has anyone done anything to move it along since the injunction? Your Honor, we have done everything possible to move this case along. The motions for summary judgment have been fully briefed and argued. There was a status conference approximately a year ago at which we informed Judge Englund that because the plan was being implemented, we would need to move for a preliminary injunction unless the underlying motions were resolved. At that hearing, Judge Englund assured us that a decision on the merits would be forthcoming very shortly. That was over a year ago. There has been no decision on the merits. And it's our sense at this point that unless this Court provides some guidance with respect to the merits, that we may never get a ruling on the merits in this case. Is the logging going on now? The logging is not going on. The status of the three projects is, as I understand it, is as follows. Timber sale contracts have been awarded, which would allow the logging companies to proceed. However, as of this time, no logging has begun. There is no legal impediment to logging continuing at any time or beginning at any time. However, the government has agreed to give us 24 days' notice before commencing operations. So depending on when a decision may be forthcoming from this panel, if, in fact, we get that notice from the government, then we would most likely be moving for an injunction pending appeal at that time. Thank you. Good morning. May it please the Court, Jennifer Scheller representing the Forest Service. I'd like to begin by emphasizing three basic points. The first is that the only things at issue here are the three specific projects, the Basin, Empire, and Slapjack projects. The entire merits of the 2004 framework is certainly not before this Court. The second important point is, of course, this is just a preliminary injunction appeal, and this Court's review is narrow, whether or not the district court abused its discretion in denying Legacy the extraordinary relief of a preliminary injunction. The third basic point is that this is a Quincy Library Group Act case. And in that act, Congress expressed a preference for testing these treatments on the Sierra Nevada to see how effective they are at reducing the risk of catastrophic wildfire. Therefore, it was entirely within the Court's discretion to consider that fact when it was evaluating the merits of Legacy's preliminary injunction. As I understand it, the only real dispute is over whether the large trees should be cut, and there's no dispute that they help reduce the fires. Is that incorrect? To the extent that we're talking about the merits, yes, that is correct. But as the district court found, and as the agency documented in the administrative record, without those larger trees to make the projects economically viable for the timber companies who would come in to do the work, the projects just wouldn't happen. Nobody would bid on them. And Legacy's offered alternative solution of seeking additional funds from Congress. I suppose that's possible, but it's not a very realistic course of action for an agency who's trying desperately to reduce the risk of these sorts of catastrophic wildfires that happened on the Plumas National Forest just last summer. If you got the money from Congress, what would that mean? Who would do the cutting? Not the cutting. Who would do the clearing of the smaller trees? I'm no expert on that sort of detail, but my understanding is that there would be two options. Either Forest Service personnel could do it, but that's usually done in very limited circumstances, or they could contract out the work to outside timber companies to do it and pay them. So the timber companies would do it if they were paid to do it as opposed to doing it in order to get the big trees. Right. You know, I think your response to Judge Reinhart opens up the question of the conflict of interest in the Forest Service. The Forest Service needs the money, so it rules in favor of the timber companies. Isn't that plainly wrong? No. And there are several reasons. The first is that the — it's not that the Forest Service needs the money. It's the Forest Service needs to get the work done. It needs the money. That makes an inarrested judge. An inarrested — suppose we needed the money and asked you to pay one of the — whoever paid us, we decide for it. That's wrong. What's the difference here? There are — let me start with the first difference, which is that, as I understand it from reading the concurring opinions in the Earth Island case, the theory is that due process is an impediment to the agency operating the way Congress has set them up to do. And when you're talking about due process, there has to be some sort of individual right at issue, and that's simply not the case here. The agency is not acting as an adjudicator of anyone's individual rights. There's no life, liberty, or property interest at stake whenever it's making the decision about whether or not to log a specific area or do any sort of action like that on the National Forests. A more fundamental point is, of course, that legacy hasn't raised this issue in this appeal. Yeah, but we can do it. It's — if it goes to the integrity of the process, we will do it. And, you know, the basic law was laid down a long time ago. The interested judge can't judge. But it's been expanded by the Supreme Court to administrative agencies. You're just another administrative agency administering a project where there are rights involved, and you don't choose to recognize you are a partial judge. With all due respect, Your Honor, I believe that the agency here is not acting in the same adjudicative way as the other cases in which the Supreme Court has extended the Toomey theory to administrative agencies. And it's not adjudicating any individual rights. No timber company, whenever the agency made the decision on the 2001 framework and on the three individual projects, no timber company had any rights to log those and see them and enjoy the forest as it existed. There just aren't any individual rights that are being adjudicated. Well, if there are no legal rights, how come you've got an opponent? We're here to decide legal rights. Should they lay out of standing? Congress has provided in the APA a limited waiver of the United States' sovereign immunity, and associated with that is it has established the standard of review for this Court to use, which is whether the agency's action was arbitrary or capricious. And ---- But isn't that a different question from whether they're standing on the part of the plaintiffs? I thought they only would be standing if they had some rights or interests in the trees or the animals or that they were a party that had some legal interest or rights. Right. The Supreme Court has explained numerous times that groups like Legacy have standing if they can show that their members use and enjoy ---- Well, that's a right, isn't it? No, no. It's not the sort of individual right. A grace? Not a right? It's an ---- it would be a potential injury to the plaintiffs if the project went forward. Right.  It's not an injury except an invasion of a right. I don't think that those two things are equal. Well, what does it injury to? It's to a right. No. It's not the sort of due process right. I mean, your answer on this problem of the Forest Service is an interested judge judging it in its own favor to raise money for itself. Your answer is, well, the other side doesn't have any rights. That's an amazing answer. They don't have the sort of property or liberty or life interests that are protected by the due process clause in this context. That's a pretty extraordinary position. That's what you've come here? Is that what the departments told you to say? Yes, in part, it is. But there are a few other answers that I'd like to give you. Okay. Go ahead. Even if there were some rights. We adjust at the end of the hour. Even if there were some rights at issue that the Forest Service was somehow adjudicating whenever it was making these particular decisions, the result would not be any sort of change in the standard of review. That's set out in the APA. It would have to be that the agency wouldn't have the power to make those sorts of decisions. But I'd like to go one step deeper and also address the question of whether or not the agency is being actually biased by the funding mechanism that's going on here. Congress has provided that all the receipts from these projects go to the Treasury, except as otherwise specifically provided by law. There are three laws that are applicable here in this context where there's green timber being sold. This is not a salvage sale, only green timber. And 25 percent of those funds go to local counties to fund schools in lieu of property taxes. And there are two other funds that the Forest Service is allowed to require timber purchasers to deposit specific funds for brush removal after the project is done and also to restore the area so that it may grow back in a productive way. There must be money that's going for, because you said the problem was an economic problem, that you couldn't do it unless you got the money. The problem is the question of whether or not there is, there are two economic problems here. When you're talking about private timber companies doing the work, the question is whether or not they can get enough money from the timber that they're harvesting to make it economically feasible or profitable for them to do the work. The other problem is if it's not a timber contracting situation like this one here, then the question is has the agency received enough appropriations from Congress to go out and do whatever cutting or spraying or whatever work it is that the agency feels is appropriate to manage the national forests. So it doesn't really, you don't really solve the bias problem, because even if the money that's received from the timber companies goes to these otherwise good funds, the key is that it's not coming out of the Forest Service limited budget. Right. Okay, so in that sense, you do have a direct financial stake. But whether or not that's the case, you mentioned the Quincy Library issue, and it says that it contemplates these pilot projects. That raises the question whether Congress had in mind that using a funding mechanism such as the lumber companies, that was part of their intent. It's another one of these, if it was, it's another one of these unfunded mandates perhaps where they tell you to go out and have these pilot projects, and yet they don't provide the funding for it, so you have to come up with the funding. I'm not sure how all of this plays out, but what troubles me is that the plaintiffs are saying here that you could accomplish the results that you want insofar as the affected areas where the populations are, which is what you cite in your briefs a lot, those fires burn through and threaten a lot of communities. We had this in the Bitterroot case a while back. Why is it not appropriate in this case to be looking at what the plaintiffs propose with the alternative being focused then only on the deep forest cutting where apparently the 2001 plan wouldn't reach? This seems to get tossed under this all or nothing bundle, which I'm having still a little trouble understanding. That's sort of an amorphous question, but maybe you could address why under the alternative options approach there shouldn't be a closer look-see, either just implementing what the original plan did or resizing the plan in light of all of the opposition that's coming up so you could address the immediate community areas and then look to other solutions for the deep forest. The district court did look at that evidence. There was evidence before the court about the economics. But he was looking under a different standard, wasn't he? I don't think so. I think his ultimate finding was that each of the three projects would not be economically viable from the timber company's perspective in order for them to bid on the projects without including these larger trees, both in the areas closer to the communities and in the areas deeper into the forest. And the other aspect of this is, since this is a Quincy Library Group Act case, it's important for the purposes of the pilot project, as far as Congress's expressed intention, to support the local communities and provide for local stability and maintaining the infrastructure base to do this type of work on the forest so that it's there for future work down the road. And so I think that the district court addressed that concern, and its findings are supported by the record. That's such a slippery slope argument. Senator Feinstein, one of her big acts was to get the preserve at the end of the administration I was familiar with. Now, her name's attached to that legislation, isn't it? Yes, it is. So what she's trying to do is keep the logging companies in business because they create jobs for the local communities, even if it means cutting down old goat trees. Is that what the purpose of the legislation was? The purpose of the legislation was to find a balance between managing the forest and maintaining some sense of stability, not just for the logging companies, but for the people who rely on those jobs, for the schools who rely on the funding, all of those sorts of community stability things that go into making a community. But I also disagree with the categorization or the characterization of this as being logging of old growth trees. We're talking about trees between 20 and 30 inches. It's really medium growth. In a lot of cases, those are trees less than 100 years old. The older growth, the larger trees, over 30 inches in diameter, aren't being affected by these projects. So I don't think that Senator Feinstein was trying to get those trees logged. I think the easiest way for this Court to look at this case and address what Judge England has done in this preliminary injunction or denying the preliminary injunction is to look at what he said about the balance of harms, which Legacy really hasn't addressed in their briefs or here on appeal. They want to focus on the merits, but in order to be entitled to a preliminary injunction, you have to show that the balance of harms tips in your favor, regardless of what standard is being applied. And Judge England made very specific and cogent factual findings that were supported by the record that given the context of these three particular projects and their importance for fire suppression, that the balance of harms based on environmental harm alone does not tip in Legacy's favor. And when you add in the fact that this is a Quincy Library Group Act project and the possible ramifications for the local communities, that further tips the balance away from granting a preliminary injunction in favor of Legacy. I'd like to return to what I think you said was your fourth and deepest answer, that the funds were not all going for the fire removal, but there's a passage from the supplemental EIS that counsel read that it's the increase in available funds from logging that can be used to increase fuel reduction work. The SEIS says that's the heart of it. If that's so, the Forest Service is a highly interested party. The interest from the Forest Service, though, is not in the sense that Toomey was talking about where funds are going to pay for, you know, the individual who is making the decision's salary. No, it isn't. Of course not. It's going to the agency to do the work the agency wants to do. Right. Instead of the agency going to Congress. Now, we have a government. They're supposed to get appropriations for government work. Instead, they're getting a payoff from the timber companies. Right. But Congress has also provided that in managing the national forests, part of that is to retrieve usable wood products from the forests. That's fine. Those objectives are good. But it's not to get into a use of coal, not to get into bed with the timber companies. Well, I don't think that we are because of the fact that most of the money is going to the Treasury. The only funds that are allowed to be purchased is the timber companies. You contradict the EIS. I would have to go back and actually look at the wording of the EIS, which I don't have in front of me here, but I think that Well, do you want to get it? It's in ER 817. I started to look at it, but it didn't finish before things got more interesting. I think what the EIS is saying is that there is this problem that the agency has in balancing what it is that timber companies would actually pay to come in and log. That is the financial interest that's at stake, is making sure that there are going to be bidders on these projects, not that the agency is trying to enrich its own budget or to, you know Is that what it's saying? It's trying to increase the fire reduction activities on the forest, not necessarily funds, because remember, it can only spend those things on cleanup after the projects are over. I'd like to Why did they use the words to increase funds if that wasn't their intent? I don't know, Your Honor. No, you don't. Unless the Court has specific questions, I'd like to talk also a little bit about the irreparable harm that Judge England addressed in his opinion. And in this context, Legacy has failed to show, as it must, both that its members will be irreparably harmed, and it hasn't shown that the species that are at issue are going to be irreparably harmed from these three specific projects. It must do those things to be entitled to a preliminary injunction. With respect to the owl, all of the core habitat is going to be maintained, and only habitat that's further out will be affected at all, and most of that small percentage of habitat is going to remain suitable for owl use. And of course, with respect to the Fisher and Martin, those two mammals just don't exist in the project areas. And so you're talking about reductions in suitability of potential habitat, which does not amount to an irreparable harm. And as Judge England properly considered, when the alternative is the risk of a catastrophic wildfire that could impact or even completely destroy large swaths of potential Fisher and Martin habitat or owl habitat, it was entirely proper for the district court to deny. This is if you're balancing nothing against the proposal. That's not true if you're balancing clearing the brush against the proposal. Right. But I think Judge England also was proper and supported by the record in concluding that without harvesting some of these medium-sized trees in the 20- to 30-inch range, that the project simply couldn't be done because they weren't economically viable and Congress hadn't provided funding. Okay. And as far as irreparable harm, what's your response to counsel's argument that the destruction of the trees is sufficient under the law? I don't read it as being sufficient under the law. I've looked at the cases that counsel cited, and I don't think that either of them actually held that. And the question fundamentally comes down to whether... You mean they say that, but don't hold it, or... Yes. You know, and certainly counsel's right that they involved logging of certain, you know, old-growth areas and had been enjoined, but I don't think that they say that that in and of itself is sufficient. And the position of the United States government is that there has to be an irreparable harm to the species, and probably to the species as a whole, but at least certainly in the forest area. It can't just be that there's some habitat that's no longer suitable for some individuals of the population. That's not an irreparable harm to the species. Was the alternative funding aspect presented to the district court in this case? I don't know, Your Honor. Counsel said that there is the State of California. It argues that there are alternatives. Yes. Certainly both Legacy and the State of California argue that the Forest Service should have considered additional alternatives when it was doing the NEPA process. However, I don't read either of their statements to be to offer any specific concrete alternatives that would have been reasonable and would have fulfilled the goals of the project, both of which would be required for the agency. I didn't see Judge England addressing any of that in his decision. Well, Judge England I think did what he should have done, which is not delve too deeply into the merits. He, you know, especially after his findings on harms and the balancing of those harms, he took a look at what Legacy was arguing and concluded that there wasn't enough there to issue a preliminary injunction. Thank you. Thank you. Thank you very much. Briefly, first the Court asked about are there mechanisms for logging smaller trees, who would do it? There are several mechanisms under the existing statute, something called a stewardship contract and service contract. So when Congress appropriates the money, the Forest Service enters into a contract with timber companies and pays them in part to do the work. So that's an established mechanism. It is, in fact, used. In some cases, it's not being used here, however. But Congress would have to appropriate the money. Congress would need to appropriate the money, and in fact, Congress does appropriate many millions of dollars to the Forest Service. Does it have to appropriate specific funds for these three projects, or is there could the Forest Service shift money around? The Forest Service could shift money, but that really goes to the heart of the alternatives question. The Forest Service hasn't looked at any alternatives. They haven't looked at, is there money elsewhere in their budget that they could use? They haven't looked at, can we seek appropriations from Congress? How about our State and local partners? You know, the ---- But still, how did this get presented to you in the district court? Where was this kind of argument? Was that focused in the district court? It was certainly discussed in our briefs, our summary judgment briefs, which were the basis for the ---- Talking about the alternative, specific alternatives? Specific funding alternatives, and it was also raised by the Attorney General in their submissions. Second point, the underlying merits of the case. Clearly, they are relevant. The three projects here implement the 2004 framework. If, in fact, as appellants argue, the framework is contrary to law, then under this Court's precedence, projects that implement the framework should be set aside. So clearly, there's no way of avoiding the merits here. They're very much relevant. Third point, Quincy Library Group Act. There was some discussion of that. Two points to emphasize about that. First, the Act explicitly says that the pilot project shall only be implemented to the extent consistent with environmental laws. Our position here is that it is not, in fact, consistent with environmental laws. Nothing in the Act gives the agency a pass from the environmental laws. And beyond that, nothing in the Act dictates the intensity of logging that's being proposed here. There's no language in the Act anywhere that says you shall log trees 20 inches or greater. That is a discretionary decision that's been made by the Forest Service. But the Council represents 20 to 30 inches. Yes. Is there a cap on it? So do you agree that these are medium growth, not the true old growth? We do not agree with that, and, you know, my clients have been out reviewing many timber sales, and there are many areas in which 20 to 30 inch trees are, in fact, the largest trees available. Well, that may be, but, you know, we think of these enormous redwoods and the like, so. Well, sadly, Your Honor, much of the true old growth has been already logged in the Sierra Nevada, so what we're addressing is the best available old forest habitat. And in many cases, the 20 to 30 inch trees constitute that. Finally, in terms of the balance of harms, we absolutely do dispute that the balance of harms was weighed appropriately. I want to point out that in terms of irreparable harm, in addition to logging of old forest being irreparable, in our opening brief at page 45, we cite specific experts who indicate that these three projects will adversely impact the species at risk. For example, one expert says that the basin project poses a risk of decreased owl survival and or reproduction due to reduction and degradation of spotted owl habitat. That is the kind of irreparable harm that warrants an injunction here. Finally, I realize my time is up. I just want to point out there are several other claims that we didn't have a chance to address today. They address specifically the basin project. There are three legal claims. We're not giving those claims up, but we would rest on our briefs with respect to those issues. You never waive arguments in briefs. Thank you very much. Thank you both very much. It was a very interesting, helpful argument. Court will stand and recess for the day. Thank you.
judges: Reinhardt, Noonan, Fisher